COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-02-237-CV
 
  
ROBERT 
MORROW WELCH, M.D.                                            APPELLANT
  
V.
  
SIMEON 
EDEN MCLEAN, INDIVIDUALLY                                   APPELLEES
AND 
AS HEIR TO THE ESTATE OF
DELORES 
MCLEAN, DECEASED, AND
SIMEON 
EDEN MCLEAN, AS NEXT FRIEND
OF 
JAMILA IMARI MCLEAN AND IMANI
ZAKIYA 
MCLEAN, MINORS
  
  
------------
 
FROM 
THE 141ST DISTRICT COURT OF TARRANT COUNTY
 
------------
 
OPINION ON REHEARING
 
------------
        We 
withdraw our opinion and judgment of March 25, 2004 and substitute the following 
in their place. We grant Simeon Eden McLean’s motion for rehearing[1] and deny his motion for en banc rehearing.
Introduction
        In 
this medical malpractice case, the primary issues we must decide are whether the 
evidence is legally and factually sufficient to support the jury’s verdict 
that Robert Morrow Welch, M.D.’s failure to diagnose pulmonary emboli in 
Delores McLean on April 24, 1996 was a proximate cause of her death from a 
massive pulmonary embolus two-and-a-half months later; whether the trial court 
erred in refusing to apply the noneconomic damages cap of the Medical Liability 
and Insurance Improvement Act to the jury’s damages award based on a finding 
that facts exist that would enable the health care provider to invoke the Stowers 
doctrine; whether the trial court erred in failing to include prejudgment 
interest in the damages cap; and whether the trial court incorrectly applied the 
settlement credit to the capped damages. Because we hold that the evidence is 
both legally and factually sufficient to support the jury's verdict and that the 
trial court correctly applied the settlement credit, but that the trial court 
erred in refusing to apply the damages cap to the jury's damages award and 
prejudgment interest, we reverse and render.
Background Facts and Procedural History
        On 
April 24, 1996, thirty-year-old Delores called Dr. Mark Godfrey, her primary 
care physician, complaining of shortness of breath and chest pain. Dr. Godfrey 
sent Delores to the emergency room at Harris Methodist Hospital HEB (hereafter, 
the emergency room) for further evaluation. Delores’s husband, Simeon, drove 
her to the emergency room. Simeon observed that Delores seemed to be 
experiencing pain when she breathed, that she held her chest, and that she 
struggled to breathe.
        When 
she arrived at the hospital at approximately 12:30 p.m., Delores was assessed by 
Raenita Pearson, the triage nurse on duty that day. Pearson observed that 
Delores had a blood pressure of 130 over 72, pulse of 101, and respirations of 
28, with a normal temperature. She noted that Delores complained of shortness of 
breath the week before, headache the day before, vomiting that day, and 
difficulty breathing. Delores did not, however, complain to Pearson about chest 
pain.
        Delores 
was then evaluated at 12:40 p.m. by staff nurse Meagan Stillwagoner. 
Stillwagoner noted that Delores complained of a sinus headache that medication 
did not improve, nausea, vomiting, and shortness of breath, mainly with 
exertion. Delores also had shallow and rapid respirations and a low blood oxygen 
saturation of 90%. Her breath sounds were normal, however, and she was breathing 
with normal effort.
        Dr. 
Welch first saw Delores about 1:10 p.m. He reviewed her history, which was 
consistent with her earlier conversations with the nurses and noted the presence 
of sinus drainage, a productive cough with green mucus, and her complaint of 
shortness of breath. Delores did not complain to Dr. Welch about chest pain, and 
he did not observe any physical signs of chest pain. Dr. Welch ordered a chest 
x-ray, a sinus x-ray, pulse oximetry, and an arterial blood gas test.[2]  He also examined Delores’s legs for evidence of 
thrombosis (the formation or presence of a blood clot within a blood 
vessel).  Because of Delores’s severe obesity, however, he did not 
consider that examination very useful.
        Delores’s 
x-rays were normal. The pulse oximetry, however, showed an oxygen saturation 
level that was below normal, and the blood gas test showed a low pO2 
of 56.  Based on Delores’s history, physical examination, x-rays, and 
laboratory data, Dr. Welch diagnosed Delores as suffering from sinusitis, 
dyspnea, bronchospasm, and hypoxemia.[3]  Dr. 
Welch believed that Delores’s shortness of breath was caused by her obesity, 
bronchospasm, infection, and mucus plugging in her lungs. He ordered ventilator 
treatments with drugs to relieve the bronchospasm, antibiotics to treat the 
infection, and cough medication.
        Altogether, 
Dr. Welch saw Delores five or six times on April 24. He noted slow improvement 
after the prescribed therapy and that Delores reported feeling almost normal. At 
4:00 p.m., Dr. Welch noted that Delores was “[d]oing well”; however, her 
4:00 p.m. oxygen saturation reading gave him the impression that her 
bronchospasm was returning. Dr. Welch did not see Delores between 4:00 and 5:25 
p.m., when he discharged her after discussing with her his diagnosis, 
prescribing medication to relieve the symptoms of bronchospasm, giving her an 
instruction sheet for home treatment of asthma (the hospital had no instructions 
for bronchospasm), and suggesting that she see her primary care physician in a 
day or two. Dr. Welch never saw Delores again.
        Following 
Dr. Welch’s instructions, Delores made an appointment with Dr. Godfrey on 
April 29, 1996. Delores told Dr. Godfrey that she had been treated at the 
emergency room and was slowly getting better, although she still became short of 
breath upon exertion. Although Delores showed Dr. Godfrey the asthma instruction 
sheet she had been given, he received no other information from the emergency 
room about Delores’s April 24 visit. Dr. Godfrey examined Delores and 
concluded that she had a sinus infection and that her shortness of breath was 
caused by bronchospasm or reactive airway disease, which can develop suddenly 
after a bout of bronchitis. He extended her antibiotics and gave her an inhaler. 
If Dr. Godfrey had known of Delores’s April 24 pO2 level of 56, 
however, that might have made a difference in his evaluation of her, because he 
knew that catastrophic problems, such as heart attack and pulmonary embolism, 
could result from such a low level of oxygenation.
        Dr. 
Godfrey next saw Delores on May 1, 1996, when she complained of chills, sore 
throat, headache, and ear pain. On May 7, 1996, Delores again sought treatment 
from Dr. Godfrey for cold sweats, nausea, vomiting, diarrhea, labored breathing, 
chills, and a low-grade fever. She told Dr. Godfrey on that visit that her 
respiratory symptoms were improving and that her main problems were 
gastrointestinal.
        On 
May 13, 1996, Delores consulted Dr. Drake, another physician in Dr. Godfrey’s 
group, regarding breathing difficulties, which then improved until the Sunday 
before July 3, 1996. On July 3, Delores again saw Dr. Godfrey and complained of 
a recent onset of cough, congestion, wheezing, and shortness of breath. Dr. 
Godfrey told Delores to restart her medications, which he had previously 
prescribed for use only as needed, and also gave her additional medications.
        On 
July 8, 1996, Delores returned to the emergency room, complaining of cough, 
congestion, fever, headache, sore throat, and difficulty breathing, which she 
reported had been intermittent since April. She also reported coughing up 
red-tinged mucous and complained of tightness in her chest when she breathed. A 
chest x-ray showed an abnormality in the upper right lobe of her lung, and based 
on Delores’s history, Dr. Jerome Novotny, the treating ER physician, concluded 
that she had pneumonia.
        Late 
in the evening on July 9, Delores collapsed at home and was taken to the 
emergency room by ambulance. She was pronounced dead shortly after midnight on 
July 10, 1996. Autopsy results revealed that the cause of Delores’s death was 
a massive “saddle” embolus that had lodged itself in her pulmonary arterial 
trunk. The autopsy further revealed evidence of left deep leg vein thrombosis 
and showed that Delores had another, not-yet-fatal embolus in the upper lobe of 
her right lung, which Dr. Novotny had mistaken for pneumonia.
        During 
the autopsy, Deputy Chief Medical Examiner Dr. Marc Krouse retained random 
samples of Delores’s normal-appearing lung tissue and a section of the right 
upper lobe of the lung that appeared abnormal. Two years later, Dr. Krouse 
prepared slides from the normal-appearing tissue for microscopic examination. 
One slide showed three microscopic emboli in two of the smaller pulmonary 
arteries. Based on their size, it was Dr. Krouse’s opinion that, in reasonable 
medical probability, these emboli were in Delores’s lungs at least four to six 
weeks before she died.[4]  Two other slides 
showed emboli that were seven days to two-and-one-half weeks old when Delores 
died.
        Simeon 
filed his medical malpractice suit on February 1, 1998. After a mistrial, 
Simeon’s claims against Dr. Welch were retried to a jury, which returned a 
10-2 verdict on February 2, 2002. The jury found that Dr. Welch’s negligence 
had proximately caused Delores’s death and that Simeon had suffered past and 
future noneconomic damages of $5,154,000. The trial court rendered judgment on 
the verdict, and this appeal followed.
Sufficiency of the Evidence
        In 
his first and second issues, Dr. Welch asserts that the evidence is legally and 
factually insufficient to sustain the jury’s verdict that his negligence in 
failing to diagnose pulmonary emboli in Delores was the proximate cause of her 
death. He contends that there is no direct physical evidence that Delores was 
suffering from pulmonary emboli at the time he treated her on April 24, 1996 and 
that the experts’ opinions that she did have a pulmonary embolism on that date 
are speculative. Importantly, Dr. Welch does not argue that if Delores was, in 
fact, suffering from a pulmonary embolism when he treated her, he was not 
negligent in failing to diagnose the condition or his negligence did not 
proximately cause her death. Thus, if on review of the record we determine that 
there is legally and factually sufficient evidence that Delores was suffering 
from a pulmonary embolism on April 24, 1996, we must uphold the negligence and 
proximate cause findings.
Elements of Medical Malpractice Claim
        A 
plaintiff in a medical malpractice case is required to prove by a preponderance 
of the evidence that the defendant’s negligence proximately caused his 
injuries. Duff v. Yelin, 751 S.W.2d 175, 176 (Tex. 1988). To do this, the 
plaintiff must prove four elements: (1) a duty by the physician to act according 
to applicable standards of care; (2) a breach of the applicable standard of 
care; (3) an injury; and (4) a causal connection between the breach and the 
injury. Denton Reg’l Med. Ctr. v. LaCroix, 947 S.W.2d 941, 950 (Tex. 
App.—Fort Worth 1997, pet. dism’d by agr.). The standard of care is the 
threshold issue that a plaintiff must establish before the factfinder determines 
if the defendant doctor deviated from the standard of care to a degree that 
constitutes negligence. See id. As a general rule, expert testimony is 
required to establish the governing standard of care and whether that standard 
has been breached. See Hood v. Phillips, 554 S.W.2d 160, 165-66 (Tex. 
1977); LaCroix, 947 S.W.2d at 950.
        To 
establish proximate cause, the plaintiff must prove foreseeability and 
cause-in-fact. Leitch v. Hornsby, 935 S.W.2d 114, 118-19 (Tex. 1996). 
With regard to cause-in-fact, the plaintiff must establish a causal connection 
between the defendant’s negligence and the plaintiff’s injuries based upon a 
“reasonable medical probability” or “reasonable probability” and not on 
mere conjecture, speculation, or possibility. Park Place Hosp. v. Estate of 
Milo, 909 S.W.2d 508, 511 (Tex. 1995); Lenger v. Physician’s Gen. 
Hosp., Inc., 455 S.W.2d 703, 706 (Tex. 1970); Marvelli v. Alston, 100 
S.W.3d 460, 470 (Tex. App.—Fort Worth 2003, pet. denied). Whether an expert 
opinion establishes a causal connection based upon a reasonable medical 
probability must be determined by the substance and context of the testimony 
rather than semantics or the use of a particular term or phrase. Burroughs 
Wellcome Co. v. Crye, 907 S.W.2d 497, 500 (Tex. 1995); Marvelli, 100 
S.W.3d at 470.
        The 
trier of fact may decide the issue of proximate cause in medical malpractice 
cases based upon (1) general experience and common sense from which reasonable 
persons can determine causation, (2) scientific principles provided by expert 
testimony allowing the fact finder to establish a traceable chain of causation 
from the condition back to the event, or (3) a probable causal relationship as 
articulated by expert testimony. Lenger, 455 S.W.2d at 706; Marvelli, 
100 S.W.3d at 470. Whether emboli were present in Delores’s lungs when Dr. 
Welch examined her in the emergency room on April 24, 1996 was clearly not a 
matter of common knowledge or within the experience of lay persons. Therefore, 
expert medical testimony based on reasonable medical probability was required to 
establish either a “traceable chain of causation” based upon general 
scientific principles or a “probable causal relationship” between 
Delores’s medical condition in late April 1996 and her death two-and-a-half 
months later on July 10. See Marvelli, 100 S.W.3d at 470.
Legal Insufficiency
        In 
determining a “no-evidence” issue, we are to consider only the evidence and 
inferences that tend to support the finding and disregard all evidence and 
inferences to the contrary. Bradford v. Vento, 48 S.W.3d 749, 754 (Tex. 
2001); Cont’l Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444, 450 (Tex. 
1996); In re King's Estate, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). 
Anything more than a scintilla of evidence is legally sufficient to support the 
finding. Cazarez, 937 S.W.2d at 450; Leitch v. Hornsby, 935 S.W.2d 
at 118. More than a scintilla of evidence exists if the evidence furnishes some 
reasonable basis for differing conclusions by reasonable minds about the 
existence of a vital fact. Rocor Int’l, Inc. v. Nat’l Union Fire Ins. Co. 
of Pittsburgh, 77 S.W.3d 253, 262 (Tex. 2002).
        “[Expert] 
opinion testimony that is conclusory or speculative is not relevant evidence, 
because it does not tend to make the existence of a material fact ‘more or 
less probable.’” Coastal Transp. Co. v. Crown Cent. Petro. Corp., 136 
S.W.3d 227, 232 (Tex. 2004); see also Tex. R. Evid. 401. Such testimony is 
incompetent evidence and cannot support a judgment. Coastal Transp. Co., 
136 S.W.3d at 232. “When the expert ‘brings to court little more than his 
credentials and a subjective opinion,’ this is not evidence that would support 
a judgment.” Merrell Dow Pharms., Inc. v. Havner, 953 S.W.2d 706, 712 
(Tex. 1997).
        There 
is no need to go beyond the face of the record to test the reliability of expert 
testimony that is challenged as merely conclusory or speculative on its face. Coastal 
Transp. Co., 136 S.W.3d at 233. When, however, the challenge to the 
testimony requires the court to evaluate the underlying methodology, technique, 
or foundational data used by the expert in forming his or her opinion, a timely 
objection must be made in the trial court when the testimony is offered to 
preserve the issue for appellate review. Id.; Mar. Overseas Corp. v. Ellis, 
971 S.W.2d 402, 409 (Tex.), cert. denied, 525 U.S. 1017 (1998).
        In 
this case, the evidence and reasonable inferences that support the jury’s 
verdict are summarized as follows:
        On 
April 24, 1996, Delores presented to the emergency room with numerous clinical 
symptoms[5] that Simeon’s experts testified were 
consistent with a pulmonary embolus. One of Simeon’s experts, Dr. Maria 
Granzotti, opined that Delores’s normal chest x-ray, occurring as it did in 
the setting of acute shortness of breath coupled with hypoxemia (deficient 
oxygenation of the blood), was “highly suggestive” of a pulmonary embolus. 
She testified that Delores’s abnormal A-a gradient was one of the “key 
factors” that increased the suspicion of pulmonary embolus and stated that she 
believed Delores’s tachycardia and low oxygen saturation level were caused by 
showers of small pulmonary emboli. Dr. Granzotti opined that, in reasonable 
medical probability, the breathing problems Delores was experiencing when she 
presented to the emergency room in April 1996 had the same origin as the 
breathing difficulties she had when she returned to the emergency room on July 
8, the day before she died of a pulmonary embolism.
        Another 
of Simeon’s medical experts, Dr. Krouse, opined that Delores’s blood gas 
levels and negative x-rays in April 1996 were, in reasonable medical 
probability, more likely than not related to thromboembolic disease or showers 
of thromboemboli. He further testified that Delores’s clinical symptoms on 
April 24, 1996, her complaint of chest pain to Dr. Godfrey before she went to 
the emergency room, and the typical history of thromboembolic lung 
disease—when correlated with the pathological evidence showing that 
microscopic pulmonary emboli were present in her lungs at least four to six 
weeks before her death—demonstrated a “high probability” that showers of 
microscopic emboli were occurring in her lungs when she presented to the 
emergency room in April 1996.
        Dr. 
Welch complains that this expert testimony is not probative evidence that 
Delores suffered from pulmonary emboli at the time he treated her because the 
symptoms, risk factors, and physical evidence underlying Drs. Granzotti’s and 
Krouse’s opinions only permit speculation that Delores suffered from that 
condition when she saw Dr. Welch. This argument requires us to look beyond the 
face of what Drs. Granzotti and Krouse said and evaluate the underlying basis of 
their opinions. See Coastal Transp. Co., 136 S.W.3d at 232-33; Mar. 
Overseas Corp., 971 S.W.2d at 412; see also Gammill v. Jack Williams 
Chevrolet, Inc., 972 S.W.2d 713, 727 (Tex. 1998) (holding expert testimony 
unreliable if too great an analytical gap exists between data relied upon and 
opinion offered). Dr. Welch does not, however, direct us to any place in the 
record where a timely objection challenging the reliability of their testimony 
was made in the trial court.
        The 
testimony of Drs. Granzotti and Krouse is not speculative on its face. Thus, to 
the extent Dr. Welch’s no-evidence complaint requires us to go beyond the face 
of their testimony to test the reliability of their opinions, it is waived.
        We 
hold that the expert testimony of Drs. Granzotti and Krouse constitutes legally 
sufficient evidence to support a finding that Delores was suffering from 
pulmonary emboli when Dr. Welch treated her on April 24, 1996. Coastal Transp. 
Co., 136 S.W.3d at 233. We turn now to Dr. Welch’s factual sufficiency 
challenge.
Factual Insufficiency
        Dr. 
Welch does not advance any additional arguments for why he believes the evidence 
is factually, as opposed to legally, insufficient. Instead, he simply contends 
that “[i]f the evidence supporting the existence of emboli is legally 
insufficient, then it must be factually insufficient when weighed against the 
record as a whole.”
        In 
deciding a factual insufficiency issue, we determine whether the evidence 
supporting the finding is so weak or the evidence to the contrary is so 
overwhelming that the answer should be set aside and a new trial ordered. Garza 
v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965). We are required to consider all 
of the evidence in the case in making this determination. Mar. Overseas Corp., 
971 S.W.2d at 406-07.
        Upon 
a thorough review of the entire record, the only evidence that we find to be 
contrary to that which proves Delores had pulmonary emboli on April 24, 1996, is 
the opinion testimony of three doctors—Dr. Welch, Dr. James Cox, and Dr. 
Godfrey, Delores’s primary care physician—and the underlying data they used 
in forming their opinions.[6] The following is a 
summary of this testimony and underlying data:
        Dr. 
Welch testified that he had considered pulmonary embolus as a possible diagnosis 
for Delores until part of the way through her treatment and his observation of 
her on repeat exams. Because Delores reported feeling “almost normal” after 
the ventilator treatments, however, Dr. Welch concluded that she was suffering 
from bronchospasm rather than a pulmonary embolus. Dr. Welch opined that there 
was “absolutely no way” Delores could have felt so much better if a 
pulmonary embolus had caused her symptoms, because the ventilator treatments 
would not have removed the clot blockage.
        Likewise, 
Dr. Cox opined that, based on a reasonable medical probability, Delores did not 
have a pulmonary embolus in April 1996. Dr. Cox based his opinions on all of 
Delores’s physical symptoms, her normal x-ray results, and the fact that she 
began feeling almost normal as a result of the ventilator treatments. He 
explained that if Delores had had a pulmonary embolus large enough to cause her 
low pO2 and blood oxygen levels, it would have been “pretty 
massive”—the size of a fingertip—and that the ventilator treatments would 
have provided minimal or no improvement because such emboli take weeks to 
dissolve and often scar the affected artery so that it never has blood flow 
again. In addition, Dr. Cox noted that the autopsy findings contained no 
evidence of pulmonary hypertension or right heart failure—things that would 
have been present if emboli had repeatedly showered in Delores’s lungs as Drs. 
Krouse and Granzotti believed.
        Finally, 
Dr. Godfrey testified that, based on his review of Delores’s medical records, 
he believed, in reasonable medical probability, that she did not have an embolus 
“at any point” when he saw her between April 29 and July 3, 1996. But he 
acknowledged that had he known of Delores’s low blood oxygen level in the 
emergency room on April 24, his evaluation of her might have been different 
because of the catastrophic problems, including pulmonary embolism, that can 
result from such a low level of oxygenation.
        Like 
many medical malpractice suits, this case comes down to a “battle of the 
experts.” In a battle of competing expert testimony, it is the sole 
prerogative of the jury to determine the weight and credibility of the 
witnesses, the obligation of the respective advocates to persuade them, and 
“our obligation to see that the process was fair and carried out according to 
the rules.” Cruz ex rel.Cruz v. Paso Del Norte Health Found., 44 S.W.3d 
622, 646 (Tex. App.—El Paso 2001, pet. denied) (holding refusal to find nurse 
negligent not against overwhelming weight of evidence where opinions of experts 
for both parties conflicted); see also Magee v. Ulery, 993 S.W.2d 332, 
336 (Tex. App.—Houston [14th Dist.] 1999, no pet.) (holding failure 
to find physician negligent not against overwhelming weight of evidence where 
jury could have believed defense expert that diagnosis was erroneous but not 
negligent); Crawford v. Hope, 898 S.W.2d 937, 942-43 (Tex. 
App.—Amarillo 1995, writ denied) (noting “battle of experts” existed in 
suit against physician for prescribing ineffective medication; weight of 
evidence was for jury and failure to find proximate cause not manifestly unjust 
or clearly erroneous). We cannot substitute our judgment for that of the jury 
simply because we may disagree with its findings. Jones v. Lurie, 32 
S.W.3d 737, 743 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (citing Herbert 
v. Herbert, 754 S.W.2d 141, 142 (Tex. 1988)). As fact finder, the jury is 
authorized to disbelieve expert witnesses. See Waltrip v. Bilbon Corp., 
38 S.W.2d 873, 882 (Tex. App.—Beaumont 2001, pet. denied).
        Here, 
the jury believed Simeon’s experts that Delores had pulmonary emboli on April 
24, 1996, rather than the experts offered by Dr. Welch who testified to the 
contrary.[7]  After examining all of the expert 
testimony and other medical evidence, both for and against the jury’s verdict 
in this case, we cannot say that the evidence supporting the jury’s finding 
that Delores was suffering from pulmonary emboli on April 24, 1996 is so weak, 
or the evidence to the contrary is so overwhelming, that the jury’s verdict 
should be set aside and a new trial ordered.  See Garza, 395 S.W.2d 
at 823.
        Because 
the evidence is both legally and factually sufficient to sustain the jury’s 
verdict, we overrule Dr. Welch’s first and second issues.
Jury Argument
        In 
his third issue, Dr. Welch asserts that Simeon’s counsel improperly informed 
the jury of the effect of its answer to Jury Question No. 2. Dr. Welch contends 
that reversal is required because the improper jury argument was incurable by 
instruction.
        The 
test for improper jury argument is whether the argument could have persuaded a 
juror of ordinary intelligence to agree to a verdict contrary to that to which 
he would have agreed but for the argument. Wells v. HCA Health Servs. of 
Tex., Inc., 806 S.W.2d 850, 854 (Tex. App.—Fort Worth 1990, writ denied). 
Reversal of a judgment because of jury argument is required only when an 
evaluation of the entire record shows that argument was improper, uninvited, 
preserved, and incurable by instruction, withdrawal, or trial court reprimand. See 
Standard Fire Ins. Co. v. Reese, 584 S.W.2d 835, 839-40 (Tex. 1979); Williams 
v. Lavender, 797 S.W.2d 410, 413 (Tex. App.—Fort Worth 1990, writ denied). 
The party seeking reversal based on an allegedly improper argument must show 
that the probability that the improper argument caused harm is greater than the 
probability that the verdict was grounded on the proper proceedings and 
evidence. Standard Fire Ins. Co., 584 S.W.2d at 840.
        In 
response to Jury Question No. 1, the jury found that the negligence of both Dr. 
Welch and Dr. Jerome Novotny proximately caused Delores’s death. Question No. 
2 asked the jury to apportion the percentage of negligence between Drs. Welch 
and Novotny. The jury found Dr. Welch seventy-five percent negligent and Dr. 
Novotny twenty-five percent negligent.
        Dr. 
Novotny was the emergency room physician who, in July 1996, allegedly 
misdiagnosed Delores’s fatal pulmonary embolus as pneumonia. During closing 
arguments, Simeon’s counsel initially urged the jury to “put . . . 80/20 in 
there”—find Drs. Welch and Novotny eighty and twenty percent negligent, 
respectively, because of Dr. Welch’s initial incorrect diagnosis of asthma 
that “got them all going off on the wrong thing” and Dr. Novotny’s 
testimony that eighty percent of his pneumonia diagnosis for Delores was based 
on her history. Dr. Welch’s counsel contended in response that only five to 
ten percent of the liability for Delores’s death should be placed on Dr. 
Welch.
        In 
rebuttal, Simeon’s counsel again pointed to Dr. Novotny’s testimony that 
eighty percent of his diagnosis was based on Delores’s history—in this case, 
a misstated diagnosis of asthma. Simeon’s counsel then continued as follows:
   
Dr. Welch, he caused the trouble for everybody after him.  He told Delores 
the wrong thing. She repeated it.  It got in her records.  The doctors 
went off on it.
  
You 
know, the bottom line is, she never had a chance after she left his emergency 
room, because of him.  Certainly didn’t have much of a chance.
 
And 
that’s why, you know, this is very, very, very important. If you put less than 
50 — 51 percent of the blame on Dr. Welch, I guarantee you that they will be 
dancing out in the hall.
  
Please, 
please, whatever you do, put more responsibility and make Dr. Welch accept 
responsibility.  Put more than half on him, and make him accept 
responsibility. And go by what Dr. Novotny says, 80 percent of it is 
history.
   
        Dr. 
Welch contends that the italicized portion of the above argument warrants a 
reversal because it informed the jury of the effect of its answer on his joint 
and several liability for the entire damages award.  See Tex. Civ. Prac. & Rem. Code Ann. § 
33.0013(b) (Vernon Supp. 2004-05) (providing that defendant found liable for 
more than fifty percent of claimant’s damages is both liable for percentage of 
damages found attributable to him and jointly and severally liable for entire 
damages award). He asserts that the argument informed the jury that a finding of 
less than fifty percent negligence would result in his being either exonerated 
completely or at least not jointly and severally liable for the entire damages 
award.
        We 
do not read the above argument as stating either of these things.  
Simeon’s counsel never mentioned joint and several liability or suggested that 
a fifty percent or less negligence finding would result in Dr. Welch’s 
exoneration. Moreover, even assuming for argument’s sake that the argument was 
improper, Dr. Welch has not shown that the probability that the improper 
argument caused him harm is greater than the probability that the verdict was 
grounded on the proper proceedings and evidence. See Standard Fire Ins. Co., 
584 S.W.2d at 840. Indeed, when taken in context, the complained-of comments 
could just as easily have been interpreted by the jury as arguing that a finding 
of more than fifty percent negligence was necessary to send a message to Dr. 
Welch that he was more responsible for Delores’s death than Dr. Novotny. 
Accordingly, we hold that the argument does not mandate a reversal. See id. at 
839-40; Williams, 797 S.W.2d at 413. We overrule Dr. Welch’s third 
issue.
Batson Challenges
        In 
his fourth issue, Dr. Welch complains that the trial court reversibly erred by 
sustaining Simeon’s Batson[8] challenge to 
two of Dr. Welch’s peremptory strikes, thereby requiring Dr. Welch to accept 
two objectionable jurors.  Dr. Welch asserts that the trial court’s 
ruling sustaining the Batson challenge was improper because the record 
clearly demonstrated an appropriate, nonracial basis for both strikes.
        Using 
a peremptory challenge to exclude a juror based on race violates the equal 
protection rights of the challenged juror.  Powers v. Palacios, 813 
S.W.2d 489, 490 (Tex. 1991).  Texas courts employ a three-part test when a 
party raises a Batson challenge to a peremptory strike:
 
•the 
opponent of the peremptory strike must establish a prima facie case of racial 
discrimination;
  
•the 
burden then shifts to the party who has exercised the strike to come forward 
with a race-neutral explanation;
  
•if 
a race-neutral explanation is offered, the trial court must determine if the 
party challenging the strike has proven purposeful racial discrimination.
  
Goode, 
943 S.W.2d at 445.
 
        Where, 
as here, the party exercising the peremptory strike offered a race-neutral 
explanation for the strike and the trial court ruled on the ultimate question of 
intentional discrimination, the preliminary issue of a prima facie case is moot. 
Id. The issue of whether the race-neutral explanation should be believed 
is purely a question of fact for the trial court, which may believe or not 
believe the proffered explanation. Id. at 445-46. But the ultimate burden 
of persuasion regarding racial motivation rests with, and never shifts from, the 
opponent of the peremptory strike. Id. at 446.
        We 
review a trial court’s ruling on a Batson challenge under an abuse of 
discretion standard. Id. Thus, we will not disturb the ruling unless the 
trial court acted arbitrarily and unreasonably, without reference to any guiding 
rules or principles. Downer v. Aquamarine Operators, Inc., 701 S.W.2d 
238, 241-42 (Tex. 1985), cert. denied, 476 U.S. 1159 (1986). Legal and 
factual sufficiency are relevant factors in assessing whether the trial court 
abused its discretion. Beaumont Bank, N.A. v. Buller, 806 S.W.2d 223, 226 
(Tex. 1991); Tex. Dep’t of Health v. Buckner, 950 S.W.2d 216, 218 (Tex. 
App.—Fort Worth 1997, no writ). An abuse of discretion does not occur, 
however, when the trial court bases its decision on conflicting evidence, as 
long as some evidence of substantive and probative character supports the 
court’s decision. Butnaru v. Ford Motor Co., 84 S.W.3d 198, 211 (Tex. 
2002); Davis v. Huey, 571 S.W.2d 859, 862 (Tex. 1978). Merely because a 
trial court may decide a matter within its discretion in a different manner than 
an appellate court would in a similar situation does not demonstrate that an 
abuse of discretion has occurred. Downer, 701 S.W.2d at 241-42.
        Because 
the first prong of the Goode test is moot in this case, we turn our 
attention to the second and third prongs of this inquiry. The record shows as 
follows:
        At 
the end of voir dire, Dr. Welch peremptorily struck venire members 7 (Franklyn 
Colon), 22 (Gloria Smith), and 86 (Gwen Jones), all of whom are 
African-American, thereby removing all African-Americans from the venire panel.[9]  Dr. Welch offered the following explanations in 
response to Simeon’s Batson challenge regarding venire members Colon 
and Smith.[10]  He stated that he struck Colon 
because
  
[H]e never responded to any questions. I made several things about avionics, and 
so forth, and I just never got any response. So, I ended up with, I don’t know 
who he is, or what he thinks.
   
        Simeon 
pointed out, however, that Colon’s responses on his juror questionnaire showed 
that he was in the Navy, was a Republican who most admired Colin Powell, and 
that he would not file suit against a doctor if he were the subject of a medical 
malpractice lawsuit. Simeon further argued, “[T]o say that he didn’t answer 
questions about avionics, when this is a black [R]epublican who doesn’t file 
lawsuits in malpractice cases, and when [Dr. Welch has] moved to strike all 
other blacks on the case, I don’t believe he’s articulated a legitimate 
nondiscriminatory reason, considering the whole of the case.”
        Dr. 
Welch’s explanation for striking Smith was that she was a paralegal. Dr. Welch 
stated that he did not take paralegals on juries due to the “grave risk that 
they will get into the jury room and start telling folks about legal matters, of 
what the meaning of legal things is.”
        Regarding 
this explanation, Simeon pointed out that, although Smith was a paralegal, she 
worked for a corporation and had stated in front of the entire venire panel 
during voir dire that she was not involved with litigants or lawsuits and did 
not have “that type of influence.” Simeon further noted that Dr. Welch had 
struck Smith but had objected to striking a white medical malpractice defense 
attorney for cause.[11]
        Simeon 
also noted that Smith had checked on her juror questionnaire that she would not 
sue the doctor if she were the subject of malpractice and had stated the same 
thing when questioned during voir dire.  In addition, Smith stated on her 
questionnaire that jury awards were sometimes excessive, that she believed there 
should be a limit on the amount of money a family could receive when suing a 
doctor, and that whether mental anguish and punitive damages should be 
recoverable would depend on the situation.  Simeon argued that all of these 
factors, when coupled with the fact that Dr. Welch had struck all the 
African-American venire members, showed that his primary reason for striking 
Smith was her race.
        Based 
on this evidence, the trial court could have reasonably disbelieved Dr. 
Welch’s stated reasons for striking Colon and Smith and found instead that Dr. 
Welch had struck these jurors based on their race.  See Goode, 943 
S.W.2d at 443. Accordingly, we hold that the trial court did not abuse its 
discretion by sustaining Simeon’s Batson challenges. See id. at 
446. We overrule Dr. Welch’s fourth issue.
Exclusion of Dr. Andrea Green’s Testimony.
        In 
his fifth issue, Dr. Welch contends that the trial court abused its discretion 
by excluding the testimony of one of his experts, Dr. Andrea Green, on the 
ground that Dr. Green’s testimony would have been cumulative of that of Dr. 
James Cox, Dr. Welch’s other expert.
        A 
trial court has the authority to exclude evidence if its probative value is 
substantially outweighed by the danger of needless presentation of cumulative 
evidence. Tex. R. Evid. 403. We 
review a trial court’s decision to exclude evidence under an abuse of 
discretion standard and will not reverse the trial court’s ruling absent an 
abuse of that discretion. See Nat’l Liab. & Fire Ins. Co. v. Allen, 
15 S.W.3d 525, 527-28 (Tex. 2000). We must uphold a trial court's evidentiary 
ruling if there is any legitimate basis for it. Owens-Corning Fiberglas Corp. 
v. Malone, 972 S.W.2d 35, 43 (Tex. 1998). Moreover, we will not reverse 
based on an erroneous evidentiary ruling unless the error probably caused the 
rendition of an improper judgment. See Tex. R. App. P. 44.1(a); Malone, 
972 S.W.2d at 43.
        In 
this case, Dr. Welch designated Drs. Andrea Green and James Cox, both board 
certified in emergency medicine, as defense expert witnesses. After Dr. Cox 
testified, Simeon moved to exclude Dr. Green’s testimony under rule 403. 
Simeon contended that allowing both Drs. Cox and Green to testify would unduly 
delay the trial with the presentation of cumulative evidence because both 
experts had similar or identical credentials and had expressed the same opinions 
during their depositions. The trial court granted Simeon’s motion and ruled 
that Dr. Green could not testify.
        Dr. 
Welch asserts that Dr. Green should have been allowed to testify in addition to 
Dr. Cox because, “[a]lthough both Drs. Green and Cox would have provided 
relatively similar (but not identical) testimony on the hotly contested issues 
in the case, the differences between the doctors themselves is such that 
testimony from both of them would add substantial weight” to Dr. Welch’s 
case.
        The 
record shows, however, that Drs. Green and Cox had similar credentials relevant 
to their testimony in this case. Both were board certified in emergency 
medicine. In addition, Dr. Cox was on staff in the emergency room department of 
a large local hospital, and Dr. Green chaired the department of emergency 
medicine at another large local hospital and practiced emergency medicine there.
        Further, 
although Dr. Welch contends that Dr. Green’s testimony was not cumulative of 
Dr. Cox’s, he does not explain how their testimony would have differed. In his 
response to Simeon’s motion to exclude Dr. Green’s testimony, Dr. Welch 
supported his assertion that there “may” be some differences of opinion 
between Drs. Green and Cox with only a single example of a potential difference.[12]  In addition, although Dr. Welch offered Dr. 
Green’s curriculum vitae and the transcript of her deposition testimony as a 
bill of exception when she was not allowed to testify, he did so without 
specifying any differences between Dr. Green’s and Dr. Cox’s testimony.
        This 
record demonstrates a legitimate basis—the similarity in opinions and 
credentials—for the trial court’s exclusion of Dr. Green’s testimony as 
needlessly cumulative of Dr. Cox’s testimony.  See Malone, 972 
S.W.2d at 43.  Thus, the record shows that the trial court did not abuse 
its discretion by excluding the testimony.  See Downer, 701 S.W.2d 
at 241-42.[13]  Indeed, the trial court limited 
both Dr. Welch and Simeon to only one expert in emergency medicine each and, at 
Dr. Welch’s request, so informed the jury.
        Finally, 
due to the similarly in both experts’ credentials and opinions, the record 
does not show that the exclusion of Dr. Green’s testimony probably caused the 
rendition of an improper judgment.  See Tex. R. App. P. 44.1(a)(1); Malone, 
972 S.W.2d at 43.  Accordingly, for all of the foregoing reasons, we 
overrule Dr. Welch’s fifth issue.
Damages Cap
        In 
his sixth issue, Dr. Welch complains that the trial court improperly refused to 
apply the noneconomic damages cap of former article 4590i, section 11.02 to the 
damages award in this case.
        Former 
article 4590i, section 11.02 (hereafter, section 11.02) provides
  
(a) In an action on a health care liability claim where final judgment is 
rendered against a physician or health care provider, the limit of civil 
liability for damages of the physician or health care provider shall be limited 
to an amount not to exceed $500,000.
 
                . 
. . .
  
(c) 
This section shall not limit the liability of any insurer where facts exist that 
would enable a party to invoke the common law theory of recovery commonly known 
in Texas as the “Stowers Doctrine.”[14]
  
The $500,000 cap is adjustable based on increases and decreases in the consumer 
price index (CPI).[15]
        In 
this case, the trial court determined that the value of the $500,000 damages cap 
was $1,446,895.40, based on a CPI of 177.1.[16]  
The trial court refused to apply the damages cap, however, due to its finding 
“that facts exist that would enable a party to invoke the . . . ‘Stowers 
Doctrine.’”  Instead, the trial court awarded Simeon $5,514,992.87 
in actual damages and prejudgment interest[17] 
against Dr. Welch, plus court costs, postjudgment interest, and ad litem fees.
        Dr. 
Welch contends that the trial court’s refusal to apply the damages cap was 
erroneous because it was contrary to the plain language of section 11.02. Dr. 
Welch asserts that section 11.02(c) does not lift the damages cap as to him, but 
merely provides that his insurer’s liability is not limited by the damages cap 
if facts exist that would enable him to invoke the Stowers doctrine.[18]
        Simeon, 
on the other hand, contends that the trial court’s refusal to apply the 
damages cap was proper because the cap does not apply to a physician’s 
liability when facts exist that would enable a party to invoke the Stowers 
doctrine.  Simeon asserts that such facts exist in this case because Dr. 
Welch’s insurer refused Simeon’s Stowers demand, in which he offered 
to settle his claims against Dr. Welch for the $1 million limits of Dr. 
Welch’s insurance policy, and the jury returned a verdict against Dr. Welch 
for substantially more than policy limits.
        Statutory 
construction is a question of law; therefore, we review the trial court’s 
decision de novo. Tex. Dep’t of Transp. v. Needham, 82 S.W.3d 314, 318 
(Tex. 2002).  In construing a statute, we must determine and give effect to 
the legislature’s intent, considering the statute as a whole and not its 
provisions in isolation.  Continental Cas. Co. v. Downs, 81 S.W.3d 
803, 805 (Tex. 2002); Nat’l Liab. Fire Ins. Co., 15 S.W.3d at 
527.  Unless a statute is ambiguous, we discern that intent from the 
language of the statute itself. Continental Cas. Co., 81 S.W.3d at 805.
        We 
first look to the statute’s plain and common meaning and presume that the 
legislature intended the plain meaning of its words.  Fleming Foods of 
Tex., Inc. v. Rylander, 6 S.W.3d 278, 282, 284 (Tex. 1999); see also Tex. Gov’t Code Ann. § 311.011(a) 
(Vernon 2005) (providing that words and phrases shall be read in context and 
construed according to the rules of grammar and common usage).  If 
possible, we must ascertain the legislature’s intent from the language it used 
in the statute and not look to extraneous matters for an intent the statute does 
not state.  Allen, 15 S.W.3d at 527.
  
In applying the plain and common meaning of the language in a statute, courts 
may not by implication enlarge the meaning of any word in the statute beyond its 
ordinary meaning; such implication is inappropriate when legislative intent may 
be gathered from a reasonable interpretation of the statute as it is written.
  
Sorokolit 
v. Rhodes, 889 S.W.2d 239, 241 (Tex. 1994).
        “[W]e 
cannot be blind to the plain language” of a statute.  Republicbank 
Dallas, N.A. v. Interkal, Inc., 691 S.W.2d 605, 607 (Tex. 1985).  “It 
is imperative that the citizens of this State be able to rely on the plain 
meaning of our laws to determine their rights and responsibilities.”  Fleming 
Foods, 6 S.W.3d at 286.
        Looking 
to the plain and common meaning of the words used in section 11.02, and 
presuming that the legislature intended the plain meaning of those words, we 
hold that section 11.02(a) limits Dr. Welch’s liability for Simeon’s 
noneconomic damages to $500,000, as adjusted by the CPI, and that section 
11.02(c) applies only to insurers and does not lift the damages cap applicable 
to physicians.  To construe former section 11.02(c) to apply to physicians, 
as Simeon urges and as the trial court did in this case, would improperly 
enlarge the meaning of the phrase, “[t]his section shall not limit the 
liability of any insurer,” beyond its ordinary meaning.  See 
Sorokolit, 889 S.W.2d at 241.  The word “insurer” does not, in its 
ordinary sense, include a physician.  See Merriam Webster’s Collegiate Dictionary 
607 (10th ed. 1994) (defining “insurer” as “one that insures; 
specif[ically]: an insurance underwriter”).  Moreover, such a 
construction would be inappropriate when the legislature’s intent to apply 
section 11.02(c) only to insurers can be easily understood from a reasonable 
interpretation of the statute as written.  See Sorokolit, 889 S.W.2d 
at 241.
        Likewise, 
the plain meaning of other terms used in section 11.02(a) shows that the 
legislature did not intend section 11.02(c) to affect the damages cap.  For 
instance, section 11.02(a)’s damages cap applies only to physicians and health 
care providers and only “[i]n an action on a health care liability claim.”[19]  By statutory definition, a health care liability 
claim can only be asserted against a physician or health care provider; it 
cannot be asserted against an insurer.[20]  
Therefore, an insurer cannot be liable to an injured patient under former 
article 4590i, and section 11.02(c)’s provision that an insurer’s liability 
is not limited is not — and cannot be — a reference to a health care 
liability claim. Instead, the insurer’s liability referred to in section 
11.02(c) can only be the insurer’s Stowers liability to the insured 
physician. See Hernandez v. Great Am. Ins. Co. of N.Y., 464 S.W.2d 91, 94 
(Tex. 1971) (stating that tort of insurer in mismanaging insured’s defense is 
harmful to insured alone); Wheelways Ins. Co. v. Hodges, 872 S.W.2d 776, 
782 (Tex. App.—Texarkana 1994, no writ); Whatley v. City of Dallas, 758 
S.W.2d 301, 307 (Tex. App.—Dallas 1988, writ denied) (both holding that Stowers 
claim that insurer negligently failed to settle injured party’s suit against 
insured belongs to insured).[21]
        Further, 
the legislative history supports our construction of this statute.  An 
early House version of bill 1048, which became former article 4590i, provided 
that a physician’s or health care provider’s civil liability would 
not be limited where facts exist that would enable a party to invoke the Stowers 
doctrine.[22]  While this version of bill 1048 
would support Simeon’s position, it was not enacted into law. Instead, after 
testimony and debate on the matter, the legislature enacted the Senate version 
of bill 1048, which provided that an insurer’s liability—rather than 
a physician’s or health care provider’s—was not limited in those 
circumstances.[23]  Former 4590i, section 11.02, 
is taken verbatim from the Senate version of bill 1048.[24]  
This final version of the statute that the legislature enacted addresses 
concerns raised during floor debate in the House about how to limit 
physicians’ liability while at the same time encouraging insurers to settle.[25]
        We 
are unpersuaded by Simeon’s argument that the damages cap must be lifted as to 
physicians in order to provide a large enough “stick” or “carrot” to 
induce insurance companies to enter into settlement negotiations in good 
faith.  This argument is premised primarily on a letter from Senator 
Schwartz, one of the bill’s cosponsors—written over twenty years after the 
enactment of former article 4590i—and a law review article that relies heavily 
on Senator Schwartz’s letter.[26]  “[C]ourts 
construing statutory language should give little weight to post-enactment 
statements by legislators.  Explanations produced, after the fact, by 
individual legislators are not statutory history, and can provide little 
guidance as to what the legislature collectively intended.”  In re 
Doe, 19 S.W.3d 346, 352 (Tex. 2000) (quoting C & H Nationwide, Inc. 
v. Thompson, 903 S.W.2d 315, 329 (Tex. 1994) (Hecht, J., concurring & 
dissenting) (citations omitted)).[27]
        The 
problem with postenactment statements is that they were not available to other 
legislators at the time they considered the bill in question and therefore could 
not have influenced the legislative process that produced the statute.  
Lisa R. Eskow, Obtaining & Using Tex. Legislative History, in Univ. of Tex. 12th Annual Conf. on State & 
Fed. Appeals 10 (2002).  Nor is there an opportunity for other 
legislators to respond to postenactment statements prior to a vote.  Id.  
Moreover, we cannot rely on Senator Schwartz’s letter for an intent that the 
plain language of section 11.02(c) does not state. See Allen, 15 S.W.3d 
at 527.
        Further, 
in this case, even after the damages cap is applied, Dr. Welch’s insurer is 
potentially liable to him in a subsequent Stowers action for (1) the 
$446,895.40 amount by which the adjusted damages cap exceeds Dr. Welch’s 
policy limits, (2) court costs, (3) postjudgment interest, and (4) ad litem 
fees—a total amount that is significantly more than the insurer would have 
been required to pay if it had accepted Simeon’s settlement offer for policy 
limits.  Although this is not the millions for which the insurer would 
potentially be liable if the damages cap were lifted as to Dr. Welch, we believe 
it is sufficient to encourage insurers to engage in good faith settlement 
negotiations.
        We 
are also unpersuaded by Simeon’s argument that our construction of section 
11.02(c) will change the law by limiting an insurer’s liability in a Stowers 
action.[28] Stowers liability is to the 
insured for the damages the insured has suffered as a result of the insurer’s 
negligent failure to settle.  See Hernandez, 464 S.W.2d at 95; Becker 
v. Allstate Ins. Co., 678 S.W.2d 561, 561 (Tex. App.—Houston [14th Dist.] 
1984, writ ref’d n.r.e.).  Our holding does not change this principle; it 
simply limits the amount of the insured’s Stowers damages.
        Finally, 
although the trial court found that facts exist that would give rise to a Stowers 
claim, such a finding does not establish Dr. Welch’s insurer’s Stowers 
liability; he must still prove that his insurer was negligent in failing to 
accept Simeon’s Stowers demand.  See Garcia, 876 S.W.2d at 
848.  Thus, Simeon’s construction of section 11.02(c) could result in a 
physician such as Welch, if he is unsuccessful in a Stowers action, 
having to bear permanently the burden of a judgment far in excess of the damages 
cap. We do not believe the legislature intended such an absurd result,[29] particularly in situations where the physician may be 
willing to settle for policy limits but his insurer is not.[30]
        For 
all of the foregoing reasons, we hold that section 11.02(c) does not lift the 
damages cap of section 11.02(a) as to physicians.  Accordingly, the trial 
court erred by refusing to apply the damages cap to the jury’s verdict in this 
case.  We sustain Dr. Welch’s arguments in his sixth issue regarding the 
damages cap.
Capping of Prejudgment Interest
        Next, 
Dr. Welch contends that the prejudgment interest awarded in the judgment is 
subject to the damages cap.  We agree.
        The 
trial court ruled that prejudgment interest on actual damages is not capped, 
even if the damages are, and awarded Simeon prejudgment interest on the capped 
actual damages in the event this court determined that the damages cap applied 
to Dr. Welch’s liability.  The supreme court has held, however, that 
prejudgment interest on noneconomic damages is subject to section 11.02(a)’s 
damages cap because prejudgment interest is a form of compensatory 
damages.  See Columbia Hosp. Corp. of Houston v. Moore, 92 S.W.3d 
470, 474-75 (Tex. 2002).  In this case, the jury found that Simeon suffered 
actual past and future noneconomic damages of $5,154,000 and that Dr. Welch was 
liable for seventy-five percent of those damages, or $3,865,000.  This 
amount, which does not include prejudgment interest, exceeds the damages 
cap.  Accordingly, the trial court erred by awarding Simeon prejudgment 
interest in addition to the capped damages.  We sustain this portion of 
Simeon’s sixth issue.
Settlement Credit
        Finally, 
Dr. Welch argues that he is entitled to credit against the $1,446,895.40 capped 
damages of $655,993, the total dollar amount of settlements between Simeon and 
Dr. Welch’s codefendants.  As support for this argument, Dr. Welch relies 
on civil practice and remedies code section 33.012, which provides,
  
If the claimant has settled with one or more persons, the court shall further 
reduce the amount of damages to be recovered by the claimant with respect to a 
cause of action by a credit equal to one of the following, elected in accordance 
with Section 33.014:
  
(1) 
the sum of the dollar amounts of all settlements[. . . .][31]
   
        Dr. 
Welch contends that “the amount of damages to be recovered” by Simeon in 
this case under section 33.012 is limited to the capped damages amount for which 
Dr. Welch is liable.  We disagree. Section 33.012 clearly provides that the 
settlement credit is to be applied to the amount of damages to be recovered by 
the plaintiff in the entire cause of action, not merely to the damages 
recoverable against a single codefendant.
        Section 
11.02(a)’s damages cap is calculated on a per defendant basis; it applies to 
the recovery against an individual physician or health care provider defendant, 
not to the award to the individual plaintiff.  Rose v. Doctors Hosp., 
801 S.W.2d 841, 847 (Tex. 1990).  Thus, plaintiffs who recover against more 
than one defendant may obtain a judgment in excess of the damages cap as long as 
the combined statutory liability of all defendants is not exceeded.  Id.
        In 
this case, the jury found that both Drs. Welch and Novotny were liable to Simeon 
for Delores’s death.  Therefore, although Simeon could not recover more 
than the capped amount of $1,446,895.40 from Dr. Welch, he was also entitled to 
recover up to the amount of the cap from Dr. Novotny.  See id. 
(holding that plaintiff was entitled to judgment for up to amount of capped 
damages multiplied by number of defendants found liable to plaintiff); Wynn 
v. Cohen, 864 S.W.2d 205, 206-07 (Tex. App.—Houston [14th Dist.] 1993, 
writ denied) (holding that Rose’s “multiplication theory” applied 
to damages subject to settlement credit under section 33.012).  The jury 
found that Simeon suffered actual past and future damages of $5,154,000 and that 
Dr. Novotny was liable for twenty-five percent of those damages, or 
$1,288,500.  Accordingly, had Simeon not settled with Dr. Novotny, he would 
have been entitled to recover $2,735,395.40 in actual damages with respect to 
his medical negligence cause of action.[32]   It 
is from this amount, not merely the capped damages for with Dr. Welch is liable, 
that the settlement credit should have been deducted.
        A 
deduction of the $655,993[33] claimed settlement 
credit from $2,735,935.40 would not have affected the capped damages as to Dr. 
Welch.  Therefore, the trial court did not err by failing to deduct the 
settlement credit from Dr. Welch’s portion of the capped damages.  We 
overrule Dr. Welch’s argument in his sixth issue regarding the settlement 
credit.
Conclusion
        Having 
sustained Dr. Welch’s sixth issue in part, we hold that the noneconomic 
damages cap of the Medical Liability and Insurance Improvement Act applies to 
the jury’s damages award and that the maximum amount Simeon can recover from 
Dr. Welch is $1,446,895.40.  Accordingly, we reverse the trial court’s 
judgment awarding Simeon the entire damages award and, using the trial court’s 
calculations in its judgment,[34] render judgment 
awarding damages based on the damages cap as follows:
•To 
Simeon individually, $140,366.21;
•To 
Simeon as heir to the Estate of Delores McLean, $43,232.80;
•To 
Simeon as next friend of Jamila Imari McLean, $631,648.11;
•To 
Simeon as next friend of Imani Zakiya McLean, $631,648.11.
  
We 
further render judgment that Simeon is not entitled to any prejudgment interest 
on these amounts, but is entitled to postjudgment interest, court costs, and ad 
litem fees as awarded in the trial court’s judgment.
  
   
                                                                  JOHN 
CAYCE
                                                                  CHIEF 
JUSTICE
 
 
PANEL 
A:   CAYCE, C.J.; HOLMAN and GARDNER, JJ.
 
DELIVERED: 
June 2, 2005


NOTES
1.  
McLean sued in his individual capacity, as heir to the estate of Delores McLean, 
deceased, and as next friend of Jamila Imari McLean and Imani Zakiya McLean, 
minors. For simplicity, we refer to him in all these capacities as “Simeon.”
2.  
A pulse oximeter is a small device that clips on a finger or other extremity and 
estimates a person’s blood oxygen saturation—the amount of oxygen being 
carried by arterial blood.  A blood gas test is a blood test that directly 
measures the partial pressure oxygen (pO2) and carbon dioxide (pCO2) 
in arterial blood.  It is a more accurate test than pulse oximetry.
3.  
Dyspnea is awareness of the sensation of breathing, or shortness of breath, and 
hypoxemia is deficient oxygenation of the blood.  Bronchospasm is a 
decrease in the diameter of the airway, due to either internal spasm or 
swelling.
4.  
Four to six weeks before Delores’s death was May 29 to June 12.
5.  
These symptoms included a low pO2 level of 56, a low-normal pCO2 
level of 33, a widened A-a gradient (the gradient between the oxygen pressures 
in the alveoli and the arteries), a low oxygen saturation level, shortness of 
breath, and a rapid pulse rate.
6.  
Another of Dr. Welch’s experts, Dr. Dudley Davenport Jones, opined that, while 
there was evidence of “prior” thromboembolism to Delores’s small blood 
vessels, it could not be determined “with any precision” whether the 
microscopic emboli found in Delores’s lung tissue after her death were there a 
month or two-and-a-half months before her death.  According to Dr. Jones, 
“[i]t could be either way.”  Because this equivocal opinion testimony 
does not tend to disprove that Delores had pulmonary emboli on April 24, 1996, 
we do not consider it to be contrary to the finding at issue.
7. 
In our original opinion, we reasoned that Dr. Krouse was prohibited from 
stacking inferences to reach his opinion that emboli were showering in 
Delores’s lungs on April 24, 1996.  Welch v. McLean, 
No.02-02-00237-CV, 2004 WL 595042, at *9 (Tex. App.—Fort Worth, March 25, 
2004, no pet. h.); see Schlumberger Well Surveying Corp. v. Nortex Oil & 
Gas Corp., 435 S.W.2d 854, 858 (Tex. 1968) (holding that party may not 
establish a vital fact by stacking one inference upon another).  Thus, we 
held that the evidence supporting the verdict was too weak to be factually 
sufficient.  Welch, 2004 WL 595042, at *9.  In his motion for 
rehearing, however, Simeon correctly points out that the opinions of medical 
experts are an exception to the rule against inference stacking.  See 
Tex. Empl. Ins. Ass'n v. Talmadge, 256 S.W.2d 945, 951-52 (Tex. Civ. 
App.—Beaumont 1953, writ ref’d n.r.e.); S. Underwriters v. Hoopes, 
120 S.W.2d 924, 926 (Tex. Civ. App.—Galveston 1938, writ dism’d) (both 
holding that medical expert testimony is exception to inference stacking rule); see 
also White v. Presnall, No. 05-93-01029-CV, 1994 WL 416724, at *6 (Tex. 
App.—Dallas, Aug. 10, 1994, writ denied) (not designated for publication) 
(holding application of prohibition against inference stacking to medical expert 
testimony “untenable” because courts are incapable of assessing relationship 
between direct and inferred facts established by such testimony).
8.  
Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712 (1986).  In Batson, 
the Supreme Court held that a criminal defendant is denied equal protection 
under the United States Constitution if a prosecutor uses peremptory challenges 
to exclude members of the jury panel solely on the basis that their race is the 
same as the defendant's.  Id. at 88-89, 106 S. Ct. at 1718-19.  
Batson’s reach has been extended to civil trials.  Goode v. 
Shoukfeh, 943 S.W.2d 441, 444 (Tex. 1997).
9.  
Simeon and his family are African-American.
10.  
The trial court denied Simeon’s Batson challenge to Jones, and Simeon 
has not appealed that ruling.  Therefore, we do not discuss Dr. Welch’s 
reasons for striking Jones.  After the trial court sustained Simeon’s Batson 
challenges to Colon and Smith, they were seated on the jury.
11.  
Dr. Welch contended that he had not objected to the trial court’s discharge 
for cause of the white attorney—who was or had been opposing counsel against 
Simeon’s attorney in at least two cases.  The record shows that Dr. Welch 
objected initially when the trial judge said, “I think we need to let him 
go.” Dr. Welch did not ultimately object to the attorney being discharged for 
cause—but only after the attorney was questioned extensively and stated 
repeatedly that he was concerned that his work as a defense attorney carried 
with it “an inherent potential for bias or some concern for that.”
12. 
Dr. Welch quoted the following alleged excerpt from Dr. Cox’s deposition 
testimony as evidence that his and Dr. Green’s opinions “may” differ:
Q. 
Okay. Do you agree with Andrea Green, Dr. Welch’s emergency room expert, that 
Delorse McLean, quote, had obesity and the use of birth control pills as risk 
factors?  Do you agree with the statement as is?
A. 
As is, no.
   
Absent 
further elaboration by Dr. Cox, we do not read this response as indicating his 
disagreement with Dr. Green’s testimony.
13.  
Dr. Welch’s authorities are inapposite because they involved witnesses whose 
relationship with a party or whose interest in the outcome of the case 
diminished their credibility.  See Sims v. Brackett, 885 S.W.2d 450, 
454 (Tex. App.—Corpus Christi 1994, writ denied) (holding, in case where 
plaintiff’s first expert was plaintiff’s friend, that second expert should 
have been allowed to testify because his more specialized credentials and lack 
of personal relationship with plaintiff would have made him more credible than 
first expert); Bohmfalk v. Linwood, 742 S.W.2d 518, 521 (Tex. 
App.—Dallas 1987, no writ) (holding that trial court improperly excluded 
testimony of disinterested witness whose testimony corroborated testimony of 
interested witness).  Although Dr. Cox was once on the hospital’s 
emergency room staff, he had left there at least fifteen years before testifying 
at trial, and there is no evidence that his past association with the hospital 
damaged his credibility with the jury.
14.  
Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 11.02(a), (c), 1977 Tex. Gen. 
Laws 2039, 2052 (repealed 2003) (current version at Tex. Civ. Prac. & Rem. Code Ann. § 
74.303(a), (d) (Vernon 2005)). The $500,000 damages cap does not apply to 
damages awarded for past and future medical, hospital, and custodial care.  
Id. § 11.02(b).
15.  
Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 11.04, 1977 Tex. Gen. Laws 
2039, 2053 (repealed 2003) (current version at Tex. Civ. Prac. & Rem. Code Ann. § 
74.303(b) (Vernon 2005)).
16.  
Dr. Welch argues that a slightly lower CPI of 172.9 for December 2001 applies, 
resulting in a capped value of $1,398,850, and he asks us to take judicial 
notice of these figures.  We decline to do so because Dr. Welch has not 
supplied documentation showing what the CPI was in December 2001, nor has he 
explained why the December 2001 CPI should apply to the trial court’s 
judgment, which was rendered on April 12, 2002.  See Tex. R. Evid. 201(d).
17.  
This amount was awarded to Simeon individually, as heir to Delores’s estate, 
and in his capacity as next friend for Jamila and Imani.
18.  
The Stowers doctrine has its origins in the case of G.A. Stowers 
Furniture Co. v. Am. Indem. Co., 15 S.W.2d 544 (Tex. Comm. App. 1929, 
holdings approved).  Under this doctrine, an insurer is required to 
exercise “that degree of care and diligence which an ordinarily prudent person 
would exercise in the management of his own business” in responding to 
settlement demands within policy limits. Id. at 547. The Stowers 
duty is activated by a settlement demand if three prerequisites are met: (1) the 
claim against the insured is within the scope of coverage; (2) the settlement 
demand is within the policy limits; and (3) the terms of the demand are such 
that an ordinarily prudent insurer would accept it, considering the likelihood 
and degree of the insured's potential exposure to an excess judgment.  Am. 
Physicians Ins. Exch. v. Garcia, 876 S.W.2d 842, 848-49 (Tex. 1994).
19.  
See Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 11.02(a), 1977 Tex. 
Gen. Laws 2039, 2052.
20.  
See Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.03(4), 1977 Tex. 
Gen. Laws 2039, 2041 (limiting a health care liability claim to “a cause of 
action against a health care provider or physician”) (current version at Tex. Civ. Prac. & Rem. Code Ann. § 
74.001(13) (Vernon 2005)).  When a term is statutorily defined, we are 
bound to construe the term by its statutory definition.  Tex. Gov’t Code Ann. § 311.011(b) 
(Vernon 2005); Needham, 82 S.W.3d at 318; Transp. Ins. Co. v. 
Faircloth, 898 S.W.2d 269, 274 (Tex. 1995).
21.  
Simeon’s construction of sections 11.02(a) and (c) is inconsistent.  He 
agrees that section 11.02(a)’s damages cap applies only to health care 
liability claims because that is what the plain language of section 11.02(a) 
says.  But he contends nonetheless that section 11.02(c) applies to 
physicians even though the plain language of section 11.02(c) does not mention 
them.  Simeon further contends that the purpose of former article 4590i is 
to limit liability insurers’ payments for health care liability claims 
“except in a Stowers situation.”  This purpose is not, however, 
listed in the statute. Instead, the Act’s stated purposes include decreasing 
the cost of health care liability claims “in a manner that will not unduly 
restrict claimants’ rights” and making liability insurance available to 
physicians at reasonably affordable rates—all in order to alleviate the 
medical malpractice insurance crises in Texas and its concomitant adverse 
effects on the availability of medical care.  See Act of May 30, 
1977, 65th Leg., R.S., ch. 817, § 1.02(a)(4)-(5), (b)(2)-(4), 1977 Tex. Gen. 
Laws 2039, 2040.
22.  
That version of H.B. 1048 provided as follows:
  
LIMIT ON CIVIL LIABILITY.  In an action on a health care liability claim 
where final judgment is rendered against a physician or health care provider, 
the limit of civil liability for damages of the physician or health care 
provider shall be limited to an amount not to exceed $500,000.  This 
section shall not limit the liability where facts exist that would enable a 
party to invoke the common law theory of recovery commonly known in Texas as the 
“Stowers’ Doctrine.”
  
House Comm. on State Affairs, Bill Analysis, 
Tex. H.B. 1048, 65th Leg., R.S. (1977) (emphasis supplied).
23.  
During testimony regarding bill 1048 before the Senate Committee on 
Jurisprudence, Mr. Ace Pickens, representing the Texas Medical Association, 
stated,
  
There is one thing that I hope you will consider and that is a section in the 
bill that relates to the Stowers doctrine of which I am sure you are familiar 
with [sic].  It’s always been my understanding that the Stowers Doctrine 
applied to insurers and not to the defendants.  I believe that they have 
perhaps created another cause of action in this bill because they made the 
so-called Stowers Doctrine apply to insurer, physician, or health care provider, 
and I would hope that you would take out the word physician or health care 
provider and just leave the Stowers doctrine applying to the insurance company 
where it always has been heretofore.
  
Texas 
Medical Liability Insurance Improvement Act of 1977: Hearings on Tex. S.B. 1048 
Before Senate Comm. on Jurisprudence, 65th Leg., R.S. (March 29, 1977) 
(statement of Mr. Ace Pickens) (transcript available from Legislative Intent 
Research, Austin, Texas).
        In 
the Conference Committee’s side-by-side comparison of bill 1048, the 
description of the House version states, in pertinent part: “applies Stowers 
Doctrine to ‘insurers, physicians, or health care providers.’”  The 
description of the Senate version states, “applies Stowers Doctrine to 
‘insurers’ only.”  The bill comparison then states that the Senate 
version has been accepted.  See Conf. Comm. Report, Side-By-Side Analysis, 
S.B. & H.B. 1048, 65th Leg., R.S. (1977).
24.  
See Senate Comm. on Jurisprudence 
Report, Tex. S.B. 1048, 65th Leg., R.S. (1977).
25.  
During debate in the House Committee on State Affairs regarding H.B. 1048, the 
following exchange occurred:
  
REP. UHER: [W]hen you have a claim, of course, we go into this notice and 
negotiation.  At that point is when the company is going to become 
involved—I’m talking about your insurance—I’m talking about the 
doctor’s insurance protector—becomes involved in this negotiations, and they 
must bargain in good faith.  That’s in the bill.
REP. 
HOESTENBACH: But is there any—I mean—you can’t some teeth [sic] to make 
them stick by the rules just like the lawyers have to stick by the rules?
                . 
. . .
REP. 
HENDERSON: [W]e have an old theory of law that’s called the Stowers 
Doctrine.  And what it says is, is that if you do bargain in good 
faith—and this is a loose definition—but this is the essense of it—if you 
don’t bargain in good faith, you try to hide behind the ball, then 
you’re—then you have no limits on your liability.  So the Stowers 
Doctrine is in here, and this will be an incentive for all parties to 
participate in good faith.  And this kind of answers, I think, what 
you’re talking about Mr. Hoestenbach.
  
Debate 
on Tex. H.B. 1048 in the House Committee on State Affairs, 65th Leg., R.S. 10 - 
12 (Mar. 14, 1977).
26. 
See Letter from former Senator A.R. “Babe” Schwartz to “To Whom It 
May Concern” (Nov. 25, 1998); see also Mark D. Clore, Medical 
Malpractice Death Actions: Understanding Caps, Stowers, and Credits, 41 S. Tex. L. Rev. 467, 494-98 
(2000).  Senator Schwartz’s letter states in pertinent part as follows:
  
In my opinion, the Legislature used a “carrot and stick” approach.  
Section 11.02 establishes an incentive for all parties to bargain in good faith 
and resolve many of these claims.  Section 11.02 was intended to strongly 
warn parties and insurers who refused to bargain, and move in good faith towards 
settlement, that they would not benefit from such conduct.
The 
“carrot” for a health care provider/physician/insurer and the “stick” 
for a claimant is found in Subsection (a), the damage cap of $500,000.00 on 
final judgments.  The purpose of setting an insurer’s limits of exposure 
and a claimant’s maximum amount of recovery on a final judgment at $500,000.00 
was again meant to facilitate settlement offers within the insurance policy 
limits of the health care provider/physician.
The 
“stick” for health care provider/physician/insurer and the “carrot” for 
a claimant is found in Subsection (c).  It incorporates the common law 
Stowers Doctrine into the statute. The purpose of this language is to provide 
that an insurer’s limit of exposure and a claimant’s maximum recovery will 
be the full amount of any verdict in the event an insurer fails to accept a 
reasonable settlement demand within the policy limits of the health care 
provider/physician.
27.  
We also decline Simeon’s invitation to consider various trial court judgments 
and civil practice and remedies code section 74.303, which the legislature 
enacted in 2003 to replace section 11.02.  See Tex. Civ. Prac. & Rem. Code Ann. § 
74.303.  Neither of these sources is listed in the government code as a 
statutory construction aid, and we fail to see how either could provide insight 
into the legislature’s intent decades earlier in enacting section 11.02.  
See Tex. Gov’t Code Ann. 
§ 311.023 (Vernon 2005); see also Lee v. Mitchell, 23 S.W.3d 209, 
213 (Tex. App.—Dallas 2000, pet. denied) (stating that legislative history 
includes the enactment history of a statute).
28.  
See, e.g., Act of May 30, 1977, 65th Leg., R.S., ch. 817, § 1.02(b)(7), 
1977 Tex. Gen. Laws 2039, 2041 (providing that former article 4590i was intended 
to modify liability laws only as they relate to health care liability claims and 
not as to other areas of the Texas legal system or tort law)
29.  
See Barshop v. Medina County Underground Water Conserv. Dist., 925 S.W.2d 
618, 629 (Tex. 1996) (holding that courts should not read a statute to create an 
absurd result).
30.  
For example, Simeon asserts that Dr. Welch was willing to settle in this case, 
even though his insurer was not.
31.  
Act of May 8, 1995, 74th Leg., R.S., ch. 136, § 1, sec. 33.012(b), 1995 Tex. 
Gen. Laws 971, 974 (amended 2003) (current version at Tex. Civ. Prac. & Rem. Code Ann. § 
33.012(c) (Vernon Supp. 2004-05)) [hereafter, “section 33.012"].
32.  
See Act of May 8, 1995, 74th Leg., R.S., ch. 136, § 1, sec. 33.012(b), 
1995 Tex. Gen. Laws 971, 974.
33.  
The trial court applied a settlement credit of only $615,000 to the judgment, 
but the difference between the two numbers is irrelevant to our determination of 
this issue because neither amount would have affected Dr. Welch’s liability 
for the capped damages.
34.  
The trial court’s judgment for $5,514,992.87, represented the entire damages 
award plus prejudgment interest, less $615,000 in settlement credits.  The 
court, however, also calculated the amount of damages Simeon would recover in 
each of his capacities if a reviewing court determined, as we have, that the 
damages cap applied.